NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : : : | **Criminal No. 20-00689 (SRC)** |
| v. | : : |  |
| JAIME FONTANEZ | : : : | **OPINION & ORDER** |

**CHESLER**, District Judge

This matter comes before the Court upon the omnibus pretrial motion filed by Defendant Jaime Fontanez ("Defendant" or "Fontanez") [ECF 84]. The United States of America ("the Government") has filed its response to the motion [ECF 88], and Fontanez replied to the Government's response [ECF 91].

**I.   BACKGROUND**

The following details the facts relevant to Fontanez's omnibus motion. It is based upon the police reports and other exhibits submitted by the Government in opposition to Defendant's motion. As discussed later in this opinion, Fontanez does not identify any contrary evidence that would create a factual dispute regarding these events.

This case arises out of a string of robberies that occurred in New Jersey and New York between August 2018 and February 2019. The robbers used a similar method to carry out each robbery. Typically, two men would enter a store (usually a liquor store) with their faces covered. One would go behind the counter to the cash register and the other would hold up the employees

1

and customers of the store using a handgun. After the robbers emptied the cash register, they would leave the store via a getaway car driven by a third man.

On the night of November 13, 2018, two robbers entered a liquor store in Bloomfield, New Jersey. One of the robbers pointed a handgun at the customers and employees in the store while the other attempted to open the cash register. However, the robbers were unable to open the cash register and, eventually, the customers and employees chased the robbers away from the store. As they were fleeing towards their getaway car, one of the robbers discharged the handgun in the direction of the store.

After the robbers fled, the Bloomfield police were called to the scene. They were able to view the robbery on the store's surveillance cameras and recovered the fired bullet and spent shell casing from the scene. Furthermore, the store owner provided a description of one of the robbers as a light-skinned male wearing a black-hooded sweatshirt, gloves, and blue jeans. Finally, surveillance cameras positioned at a residence in the nearby neighborhood captured the robbers entering the getaway vehicle and fleeing. From these cameras, the police were able to identify the getaway vehicle as a Silver Honda Civic ("the Silver Civic") with the license plate number T23KDA.

The police were able to trace the vehicle and license plate number to Carmen Abreu[1] who lived at an address in Elizabeth, New Jersey. In the early morning hours of November 14, the police went to Abreu's address, found the Silver Civic in the driveway, and began surveilling the residence. Around 3:00 AM, they saw Abreu exit the residence and enter the driver's seat of the

---

[1] Initially, the search for the license plate number indicated that the vehicle was registered to a man with a residence in Oakland, New Jersey. Police officers questioned the man who told them that he had bought the car for Abreu because he had good credit and she did not.

2

car. Shortly thereafter, they saw a light-skinned male, wearing blue jeans and a black-hooded sweatshirt under a camouflage jacket enter the passenger's seat. The man was later identified as Fontanez. Once the car left the driveway of the residence, officers stopped it. They removed Fontanez and Abreu from the car, handcuffed them, and put them in separate patrol cars. Minutes later, the officers recognized that Fontanez resembled photographs of the perpetrator of two robberies that occurred days earlier in Elizabeth and Rahway.[2]

The Silver Civic was impounded and Fontanez and Abreu were both brought to the Bloomfield police station. At the police station, Fontanez provided officers with his pedigree information, including his cell phone number, and the officers obtained a buccal DNA swab from him. Eventually, however, Fontanez refused to speak to the police after being read his Miranda rights. On the other hand, Abreu waived her Miranda rights and spoke to the officers. She told them that she owned the Silver Civic and that she had been asleep in her home at the time the robberies had taken place. She also provided her consent to allow the police to search the Silver Civic. During the search of the car, the police found multiple pairs of gloves, a cell phone owned by Fontanez,[3] and an E-Z Pass transponder linked to an account registered in Fontanez's name.

Ultimately, the Essex County Prosecutor's Office notified the Bloomfield Police Department that it did not believe there was enough evidence to charge either Fontanez or Abreu with a crime. Therefore, they were both released, and the police continued their investigation of the robberies over the next couple of months. As part of that investigation, on November 27, 2018, the police obtained a search warrant from Essex County Superior Court for the cell phone

---

[2] The officers obtained the photographs of the earlier robberies from TRAKS reports, which are basically all-points bulletins for law enforcement containing information about criminal activity.
[3] Abreu confirmed during the search that the cell phone recovered by the police was owned by Fontanez.

3

owned by Fontanez. That same day, investigators issued a subpoena to E-Z Pass seeking information about Fontanez's account. Finally, on December 12, 2018, the police obtained a Communications Data Warrant from Essex County Superior Court requiring AT&T to provide information associated with Fontanez's cell phone number. Fontanez was eventually arrested in connection with the robberies on February 20, 2019.

In August 2020, a grand jury returned a multiple-count indictment against Fontanez related to the robberies. He was charged with Conspiracy to Commit Robbery (Count One); five counts of Hobbs Act Robbery (Count Four, Count Six, Count Eight, Count Ten, and Count Twelve); four counts of Brandishing a Firearm During and in Relation to a Crime of Violence (Count Five, Count Seven, Count Eleven, and Count Thirteen); and one count of Discharging a Firearm During and in Relation to a Crime of Violence (Count Nine).

Fontanez has now filed an omnibus pretrial motion. He seeks the following relief: suppression of all evidence seized in the aftermath of the search of the Silver Civic, disclosure of Brady and Giglio materials, early disclosure of Jencks Act materials, early disclosure of Rule 404(b) evidence, compelled preservation of rough prosecutorial notes, and permission to file additional motions. The Court will address each of Fontanez's requests in turn.

## II.   DISCUSSION

### A. Defendant's Motion to Suppress All Evidence Seized by the Police on November 14, 2018 and Any Derivative Evidence Subsequently Obtained

Fontanez first moves this Court to suppress evidence obtained by the police in the aftermath of the stop and search of the Silver Civic and his arrest on November 14, 2018. He also requests an evidentiary hearing to resolve factual issues related to his motion to suppress. For the

4

reasons that follow, the Court will deny Fontanez's motion for an evidentiary hearing and deny his motion to suppress.

1. The Motion for an Evidentiary Hearing

Because Fontanez has not presented any disputed issues of material fact that affect the outcome of his motion to suppress, the Court will deny his motion for an evidentiary hearing. Federal Rule of Criminal Procedure 12(c)(1) states that a District Court "may" schedule an evidentiary hearing on a pretrial motion. Fed. R. Crim. P. 12(c)(1). In the context of a motion to suppress, the procedure for a defendant who seeks an evidentiary hearing is to "(1) state a colorable legal claim, (2) identify facts material to that claim, (3) show why the facts are disputed, and then (4) request a hearing to resolve that dispute." United States v. Hines, 628 F.3d 101, 106 (3d Cir. 2010). A motion to suppress only requires a hearing if it is "sufficiently specific, non-conjectural, and detailed to enable the court to conclude" that defendant has raised material facts related to his constitutional claim. Id. at 105; see also United States v. Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996).

Here, Fontanez has not identified any issues of material fact related to his constitutional claim that the police arrested him without probable cause, thereby tainting all the evidence procured on the morning of November 14. In his Reply Brief, Fontanez argues that an evidentiary hearing is necessary to determine facts related to (1) the probable cause to arrest him after the police stopped the Silver Civic and (2) Abreu's consent to search the vehicle. (Fontanez Reply Br. at 1–2). However, neither inquiry necessitates an evidentiary hearing.

First, as to the probable cause determination, Fontanez argues there are disputed facts related to the state of law enforcement knowledge at the time he was arrested on November 14.

5

But he offers only the bare assertions that "[i]t is not clear when the decision was made to arrest Fontanez. . . ." (Fontanez Br. at 5). He does not identify any evidence, via an affidavit or otherwise, that would contradict the timeline and details of the investigation provided by the police reports and body cam footage. See United States v. Garrett, No. 19-cr-00350, 2020 WL 3546743, at *2 (D.N.J. June 30, 2020) (denying a request for an evidentiary hearing where defendant's motion was based on "conjectural claims" without any evidence or affidavits in support).

Indeed, instead of disputing this timeline, Fontanez appears to largely agree with the Government's version of events. See Hines, 628 F.3d at 106 (explaining that an evidentiary hearing is unnecessary where the defendant's suppression motion "agreed with the version of events that the government put forward"). He agrees the police were able to ascertain that Abreu owned the Silver Civic from the neighborhood security footage that captured the robbery in Bloomfield. (Fontanez Br. at 1). And he admits the police eventually pulled over the Silver Civic after they saw him and Abreu enter the vehicle and drive away in the early morning hours of November 14. (Fontanez Br. at 1). Without anything beyond a bare assertion that there are disputed facts, and given the documentation of the police investigation contained within the police reports and body cam footage, this Court need not hold an evidentiary hearing as to whether the police had probable cause to arrest Fontanez.

Second, Fontanez argues that there are material disputes of fact related to the voluntariness of Abreu's consent to the search of the Silver Civic. (Fontanez Reply Br. at 2). However, he again does not point to any evidence beyond this bare assertion. See United States v. Peoples, No. 20-cr-00267, 2021 WL 1997383, at *4 (D.N.J. May 19, 2021) (denying a request

6

for an evidentiary hearing where defendant failed to point to any disputed facts). Furthermore, and importantly, the interview in which Abreu provided her consent to search the vehicle was recorded and submitted to the Court. (See Gov. Br. Ex. E). Thus, the Court need not hold an evidentiary hearing to determine the voluntariness of Abreu's consent.

> 2. The Motion to Suppress

On the merits, Fontanez seeks to suppress three categories of evidence. The first category consists of the evidence found during the search of the Silver Civic including: (1) a cellphone owned by Fontanez, (2) a pair of black gloves, (3) a second pair of black latex gloves, (4) another single black latex glove, (5) a pair of aqua batting gloves, (6) a pair of black and white work gloves, and (7) a New Jersey E-Z Pass transponder owned by Fontanez. (Fontanez Br. at 5). The second category is the information obtained by the police after he was in custody including: (1) a buccal DNA swab and (2) Fontanez's cell phone number. (Fontanez Br. at 5, 6–7). The third category is any information obtained by the police after his arrest on November 14 from the following sources: (1) the search warrant for his cell phone, (2) the subpoena issued to E-Z Pass for information pertaining to his account, and (3) the search warrant for his cell phone number. (Fontanez Br. at 5–7); (Fontanez Reply Br. at 3). Fontanez argues that all this evidence was the fruit of an illegal seizure—his arrest without probable cause. Each of these claims fails, however, for separate reasons. The Court will address each category in turn.

> i. *The Search of the Silver Civic*

First, Fontanez does not have standing to challenge the search of the Silver Civic. The Fourth Amendment guarantees the right of individuals to be "secure in their persons, house, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV.

7

However, Fourth Amendment rights are personal rights that may not be vicariously asserted on behalf of a third-party. Rakas v. Illinois, 439 U.S. 128, 133–34 (1978). Rather, "an individual challenging a search has the burden of establishing that he had a reasonable expectation of privacy in the property searched and the item seized." United States v. Burnett, 773 F.3d 122, 131 (3d Cir. 2014) (citing Minnesota v. Olson, 495 U.S. 91, 95–97 (1990)). In the context of a vehicle search, "[p]assengers in cars. . . have no reasonable expectation of privacy in the interior of the vehicle in which they are riding." United States v. Mosley, 454 F.3d 249, 252–53 (3d Cir. 2006). Therefore, passengers generally "lack standing to object to evidence discovered in a search of a vehicle." Id. at 253 (citing Rakas, 439 U.S. at 128); see also United States v. Baker, 221 F.3d 438, 441–42 (3d Cir. 2000).

Applying that general rule here, Fontanez did not have a reasonable expectation of privacy in a car he was not driving and did not own. It is undisputed that Fontanez was not driving the car at the time it was pulled over and that he did not own the car. Baker, 221 F.3d at 441–42 ("It is clear that a passenger in a car that he neither owns nor leases has no standing to challenge the search of the car."). Nor has he argued that he maintained any sort of control over the vehicle that would warrant recognizing an expectation of privacy in the car. Id. at 442 (explaining that the inquiry into one's reasonable expectation of privacy in a vehicle is "a fact-bound question dependent on the strength of his interest in the car and the nature of his control over it. . . ."); United States v. Montalvo-Flores, No. 20-cr-00080, 2021 WL 1573842, at *4 (D.N.J. Apr. 22, 2021) (concluding that the defendant did not have a reasonable expectation of privacy in a vehicle where he was never "observed possessing, operating, or otherwise exercising

8

any sort of control" over the car). Thus, Fontanez does not have standing to challenge the search of the car.

Fontanez argues that he may contest the search of the Silver Civic because it was the result of his allegedly illegal arrest. He is correct that, when an illegal seizure of a person occurs, any evidence that is obtained as a result of that illegal seizure must be suppressed. Wong Sun v. United States, 371 U.S. 471, 485 (1963); United States v. Wrensford, 866 F.3d 76, 85 (3d Cir. 2017) ("Absent some exception, evidence obtained as a result of an illegal seizure. . . is inadmissible."). However, evidence discovered through lawful means "and not as a direct or indirect result of illegal activity" need not be suppressed. United States v. Herrold, 962 F.2d 1131, 1140 (3d Cir. 1992). Here, the search of the Silver Civic was not the result of Fontanez's allegedly illegal arrest.[4] Rather, the police had two, independent justifications for searching the Silver Civic: (1) the automobile exception to the warrant requirement and (2) Abreu's consent.

The police legally stopped and searched the Silver Civic under the automobile exception to the warrant requirement.[5] Typically, searches conducted without a warrant are per se unlawful. Katz v. United States, 389 U.S. 347, 357 (1967). However, under the automobile exception to the warrant requirement law enforcement may stop and search a vehicle if "there is 'probable cause to believe that the vehicle contains evidence of a crime.'" United States v. Donahue, 764 F.3d

---

[4] While the Court's reasoning here rests on the independent justifications for the search of the Silver Civic, it also finds that Fontanez's arrest was legal, as discussed more fully below.

[5] Fontanez appears to only contest the search of the Silver Civic as an incident to his allegedly illegal arrest rather than arguing the initial stop of the vehicle was illegal. (See Fontanez Reply Br. at 2) ("Although we do not dispute the authority to seize the vehicle in a public place. . . ."). Under Third Circuit precedent, an illegal traffic stop constitutes an illegal seizure of everyone in the car and, therefore, unlike an illegal search of the vehicle, all passengers have standing to seek suppression of the fruits of the illegal stop. Mosley, 454 F.3d at 253. However, even if Fontanez is arguing that he has standing to seek suppression of the contents of the Silver Civic because they are the fruits of an illegal stop, his argument fails. That is because the stop of the Silver Civic was legal under the automobile exception. See United States v. Rushin-Felder, No. 17-cr-00138, 2019 WL 1529492, at *6, *10 (W.D. Pa. 2017) (explaining that a passenger could not challenge the stop of the vehicle, and seek to suppress evidence subsequently obtained from the vehicle, where the stop was supported by probable cause).

9

293, 300–01 (3d Cir. 2014) (quoting United States v. Salmon, 944 F.2d 1106, 1123 (3d Cir. 1991)). Probable cause is a "practical, nontechnical conception." Illinois v. Gates, 462 U.S. 213, 231 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)). It is based on the "totality of the circumstances," Donahue, 764 F.3d at 301, and judged by the standard of "reasonable and prudent men," Gates, 462 U.S. at 231. The Court must evaluate whether the events leading up to the search or seizure are "sufficient to warrant a. . . belief that contraband or evidence of a crime will be found" when viewed "from the standpoint of an objectively reasonable police officer." Ornelas v. United States, 517 U.S. 690, 696 (1996). The government bears the burden of proving that the automobile exception applies by a preponderance of the evidence. Donahue, 764 F.3d at 300.

      The Government has proven by a preponderance of the evidence that the police had probable cause to search the Silver Civic. The police were able to obtain the make, model, and license plate number of the getaway car from the residential security footage at the scene of the robbery in Bloomfield. (Da. 2). From there, they traced the car to Abreu's residence. (Da. 5–Da. 6). They then surveilled her residence, identifying the car in her driveway as the getaway vehicle. (Da. 6). Because the police knew the Silver Civic in Abreu's driveway had been used during the robbery only hours earlier, it was "objectively reasonable" for them to believe that there would be contraband or evidence of a crime in the vehicle. See Gov't of V.I. v. Williams, 739 F.2d 936, 939 (3d Cir.1984) (finding probable cause to search and seize a car that matched the description and license plate number of the getaway car used during a robbery that occurred thirty minutes prior).

Alternatively, the search of the Silver Civic was legal because Abreu consented to it. "A search conducted pursuant to a valid consent is constitutionally permissible." Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). However, consent must be (1) given by a person with authority to consent and (2) voluntarily provided rather than obtained through coercion or duress. United States v. Stabile, 633 F.3d 219, 230 (3d Cir. 2011). The voluntariness of one's consent is determined by the totality of the circumstances. United States v. Price, 558 F.3d 270, 278 (3d Cir. 2009). The factors to be considered include the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." Id. (citing Schneckloth, 412 U.S. at 226). The Third Circuit has also considered as relevant "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions." United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003). The prosecution has the burden of proving that consent was "freely, fairly, and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968).

Here, Abreu had authority to consent to the search of the car and her consent was voluntarily provided to the police. For one, Abreu, as the driver and owner of the vehicle, clearly had authority to consent. United States v. Morales, 861 F.2d 396, 399 (3d Cir. 1988) ("[A] driver of a vehicle has the authority to consent to a search of that vehicle. . . ."); see also United States v. Shabazz, 533 F. App'x 158, 161 n.2 (3d Cir. 2013) (explaining that the driver and owner of a vehicle "had authority to consent to a full search of the vehicle").

Next, the Court has viewed the video of Abreu's interview with the police and finds that her consent was voluntarily provided. The officers read her Miranda rights at the beginning of

11

the interview. (Gov. Br. Ex. E at 3:15–4:55). They also advised her multiple times that she did not have to consent to the search and that the decision was up to her. (Gov. Br. Ex. E at 24:52, 29:13, 29:45). Although she initially indicated that she did not consent, (Gov. Br. Ex. E at 25:30–25:40), she changed her mind minutes later, affirmatively stating that the officers could search the car, (Gov. Br. Ex. E at 29:40–30:15). Moreover, after providing verbal consent, she signed a consent-to-search form. (Gov. Br. Ex. F); see United States v. Velasquez, 885 F.2d 1076, 1082 (3d Cir. 1989) (finding consent was voluntary because the defendant signed a consent-to-search form, among other factors). And finally, she consented to the search of the Silver Civic but withheld her consent when the officers asked to search her residence, (see Gov Br. Ex. E at 31:56–32:15), indicating that she was fully aware of her right to refuse consent. See United States v. Baer, 15-cr-00417, 2016 WL 4718214, at *6 (D.N.J. Sep. 9, 2016) (explaining that, although it is not required, knowledge of the right to refuse consent is highly relevant). In totality, these factors lead to the conclusion that Abreu's consent was voluntary and not the result of coercion or duress.

Fontanez argues that, even if Abreu's consent was voluntary, she provided it after she was illegally arrested and, therefore, it is the fruit of that illegal arrest.[6] But he does not have standing to challenge the legality of Abreu's arrest either. United States ex rel Wright v. Cuyler, 563 F.2d 627, 632 (3d Cir. 1977) (holding that an individual could not seek to suppress the fruits of his co-conspirator's arrest because he had no standing to contest the legality of the arrest).

---

[6] In his Reply Brief, Fontanez specifically appears to argue that Abreu's arrest (and subsequent consent to the search of the Silver Civic) was the result of his own allegedly illegal arrest. (Fontanez Reply Br. at 1) ("Thus, had the arrest not taken place when it did, Ms. Abreu would not have been arrest[ed]. . . ."). But he does not provide any support for the proposition that, if he had not been arrested, Abreu also would not have been arrested. Indeed, the two arrests happened simultaneously after both Abreu and Fontanez were found in the Silver Civic.

12

Thus, because Fontanez cannot contest the validity of Abreu's arrest, he also cannot contest the validity of her consent as the illegal fruit of that arrest.

In sum, Fontanez did not possess any privacy interests implicated by the search of the Silver Civic because he did not own the car and was merely riding as a passenger when it was stopped. Therefore, he does not have standing to seek the suppression of the fruits of that search. Moreover, his argument that the contents of the Silver Civic should be suppressed as the result of his allegedly illegal arrest is unavailing because the car was not searched as a direct or indirect result of his arrest. Instead, the police had an independent legal basis to search the car pursuant to both the automobile exception to the warrant requirement and Abreu's voluntary consent. As such, his motion to suppress the evidence found in the Silver Civic will be denied.

### ii. The DNA Swab and Fontanez's Cell Phone Number

Second, Fontanez seeks to suppress the DNA swab and the cell phone number the police obtained from him at the police station. He argues that this information was also the fruit of his illegal arrest. (Fontanez Br. at 5–6). Unlike the search of the Silver Civic, Fontanez has standing to challenge the seizure of this information—had he not been arrested, the police would not have obtained the swab and the cell phone number. However, his claim fails because the police had probable cause to arrest him.

"Law enforcement authorities do not need a warrant to arrest an individual in a public place as long as they have probable cause to believe that person has committed a felony." United States v. Burton, 288 F.3d 91, 98 (3d Cir. 2002) (quoting United States v. McGlory, 968 F.2d 309, 342 (3d Cir. 1992)). Probable cause to make an arrest exists "whenever reasonable trustworthy information or circumstances. . . are sufficient to warrant a person of reasonable

13

caution to conclude that an offense has been committed by the person being arrested." United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). Determinations of probable cause must be made "on the spot under pressure and do 'not require the fine resolution of conflicting evidence that a reasonable doubt or even a preponderance standard demands.'" Paff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir. 2000) (quoting Gerstein v. Pugh, 420 U.S. 103, 121 (1975)). The police need only have evidence to establish a probability that criminal activity has occurred. See Gates, 462 U.S. at 235. The Court considers the collective knowledge of all law enforcement officers in determining whether there was probable cause for an arrest. United States v. Belle, 593 F.2d 487, 497 n.15 (3d Cir. 1979).

Here, the police had probable cause to arrest Fontanez immediately after stopping the Silver Civic. As a collective, they were aware that the Silver Civic had been used as the getaway car during a robbery only ten miles away. (Da 6). The store owner described one of the robbers as a light-skinned male wearing a black-hooded sweatshirt and blue jeans. (Da. 1). While surveilling Abreu's residence only hours after the robbery occurred, the police saw Fontanez, a light-skinned male, enter the getaway car wearing a black-hooded sweatshirt and blue jeans. (See Da. 6). The officers at the scene believed he matched the description of the suspect.[7] (Da 6). Thus, the police stopped the getaway vehicle—the Silver Civic—near the scene of the robbery; only hours after the robbery occurred; Fontanez was in the getaway vehicle; and he matched the

---

[7] It is inconsequential that Fontanez was ultimately not the suspect described by the store owner. "[A] reasonable mistake of fact 'does not violate the Fourth Amendment.'" United States v. Delfin-Colina, 464 F.3d 392, 398 (3d Cir. 2006) (quoting United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003)). In deciding what is reasonable, the courts apply an objective standard, looking at the facts available in the moment. United States v. Harrison, 689 F.3d 301, 309 (3d Cir. 2012). Here, given the physical similarities between Fontanez and the description of the suspect, the similarities between the clothing worn by Fontanez and the clothing worn by the suspect, and Fontanez's proximity to the getaway vehicle, it was objectively reasonable for the officers to believe that Fontanez was the suspect described by the store owner.

14

description of one of the robbers. The similarity between the robbery suspect and Fontanez and Fontanez's proximity to the getaway vehicle was enough to reasonably believe that Fontanez was connected to the robbery.[8] See Riley v. California, 573 U.S. 373, 381 (2014) ("[T]he ultimate touchstone of the Fourth Amendment is reasonableness."(internal quotation omitted)).

Previous cases involving similar facts provide support for the conclusion that the police had probable cause to arrest Fontanez. For example, in United States v. Elmore, the Third Circuit held officers had probable cause to arrest the defendant where he was found operating the identified getaway vehicle fifteen miles away from the site of the bank robbery an hour and a half after the crime occurred. 548 F. App'x 832, 836–37 (3d Cir. 2013). And in United States v. Robinson, the Eastern District of Pennsylvania held the police had probable cause to arrest a defendant where he matched the description of a suspect in a robbery that occurred a day earlier. No. 13-cr-00232, 2014 WL 4408940, at *4 (E.D. Pa. Sep. 8, 2014). Out-of-circuit cases present similar dynamics. See United States v. Tilmon, 19 F.3d 1221, 1228–29 (7th Cir. 1994) (finding that the police had probable cause to arrest the defendant where he matched the description of the robber and they had identified his car as the getaway vehicle used during the robbery); United States v. Ramirez, 58 App'x 325, 326 (9th Cir. 2003) (holding that the police had probable cause to arrest the defendant when he was found driving the getaway vehicle shortly after the robbery and near the scene of the crime).

---

[8] Fontanez points out that the Essex County Prosecutor's Office did not believe they had probable cause to charge him with a crime after his arrest on November 14. (Fontanez Br. at 5). While this is true, the Court is not bound to the probable cause determinations made by prosecutors. Rather, the Court must evaluate probable cause on its own. See District of Columbia v. Wesby, 138 S. Ct. 577, 584 n.2 (2018) (describing probable cause as an objective standard).

15

Finally, even if the officers did not have probable cause at the moment the Silver Civic was stopped, their collective knowledge certainly gave them reasonable suspicion to initiate a brief investigatory seizure of Fontanez and Abreu at that time. Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Bey, 911 F.3d 139, 145 (3d Cir. 2018). And, only minutes after the police stopped the car, reasonable suspicion ripened into probable cause to arrest once the officers matched Fontanez to the photographs of previous robberies from the TRAKS reports. (Gov. Br. Ex. N at 9:40–12:15); Warren v. Twp. of Derry, No. 04-cv-02798, 2007 WL 870115, at *22 (M.D. Pa. Mar. 20, 2007) ("Reasonable suspicion can ripen into probable cause if the officers are able to gather additional incriminating information during a suspect's pre-arrest detention."). So even assuming the officers did not have probable cause to arrest Fontanez at the time the Silver Civic was stopped, the information obtained from him at the police station would not be the fruits of that illegal arrest because, by the time the police obtained that information, they had probable cause to make the arrest.

In all, because the DNA swab and cell phone number were not the fruits of an illegal arrest, Fontanez's motion to suppress this information fails.

        *iii.*    *The Search Warrant for Fontanez's Cell Phone, the Search Warrant for Fontanez's Cell Phone Number, and the E-Z Pass Subpoena*

Lastly, the Court addresses the search warrant for Fontanez's cell phone, the search warrant for his cell phone number, and the subpoena for information from E-Z Pass. The police obtained a warrant to search Fontanez's cell phone on November 27, 2018. On that same date, the police issued a subpoena to E-Z Pass for information related to Fontanez's E-Z Pass account number. After investigators had trouble accessing Fontanez's phone, (Da 45), they sought and

16

received a Communications Data Warrant seeking data associated with Fontanez's cell phone number from his mobile phone provider on December 12, 2018, (Da 36).

Fontanez seeks to suppress the evidence obtained from the cell phone warrants and E-Z Pass subpoena, arguing only that this information is also the fruit of his illegal arrest. (Fontanez Reply Br. at 3) (characterizing the warrants as "derivative evidence obtained by virtue of the illegal arrest" (internal quotation omitted)); (Fontanez Br. at 7) (explaining that the information contained in the warrant for Fontanez's cell phone number was "clearly a direct product of the concededly, initial illegal arrest, and any information garnered pursuant to a warrant. . . should be suppressed."); (Fontanez Br. at 9) (seeking the "suppression of any and all evidence seized as a result of Fontanez's illegal arrest together with other 'tainted' evidence"). This argument, however, is unavailing in light of the Court's analysis above finding that both his arrest and the search of the Silver Civic were legal. Neither the cell phone (which was found in the Silver Civic), the E-Z Pass account information (also found in the Silver Civic), nor the cell phone number (obtained after Fontanez was arrested) were the fruit of an illegal search or seizure. As such, the warrants and subpoena authorizing the police to search this material was not tainted by an illegal search or seizure. United States v. Stearn, 597 F.3d 540, 569 (3d Cir. 2010) (explaining that a warrant predicated on searches held to be legal cannot be the fruit of the poisonous tree). Therefore, Fontanez's motion to suppress the information obtained from these three sources will be denied.

**B. Defendant's Request for Disclosure of Brady and Giglio Materials**

Fontanez seeks production of evidence and materials as required under Brady v. Maryland, 373 U.S. 83 (1963). (Fontanez Br. at 10). The Government has recognized its

17

obligation to provide Brady material and affirmed that it has complied with this obligation thus far. (Gov. Br. at 39). The Government also indicated that it will continue to comply with Brady should any new exculpatory material comes into its possession. (Gov. Br. at 39). The Court considers this response by the Government as adequately addressing Defendant's request for Brady disclosures.

Moreover, Fontanez seeks early production of evidence and materials required under Giglio v. United States, 405 U.S. 150 (1972). (Fontanez Br. at 9–11). He specifically seeks disclosure of "the existence and substance of any promises of immunity, leniency, preferential treatment and contractual agreements which are in effect between the prosecution and/or any of its agents and any cooperating individuals that the prosecution intends to call as witnesses. . . ." (Fontanez Br. at 9).

The Government has correctly pointed out that it need not produce Giglio material prior to trial. (Gov Br. at 37–38); see also United States v. Higgs, 713 F.2d 39, 44 (3d Cir. 1983) ("No denial of due process occurs if Brady material is disclosed. . . in time for its effective use at trial."). Nevertheless, the Government states that it will provide Giglio material "sufficiently in advance" of trial to avoid delays. In the interest of efficiency, the Court orders that the Government must disclose Giglio material at least ten days prior to the testimony of each witness.

**C. Defendant's Request for Early Disclosure of Jencks Act Material**

Fontanez also seeks early disclosure of Jencks Act material, such as prior statements made by the Government witnesses. Under the Jencks Act, the Government is not required to provide a witness's prior statements until the completion of the witness's direct examination. 18

U.S.C. § 3500. Nor does this Court have the authority to compel the production of Jencks Act material prior to the completion of direct examination. United States v. Murphy, 569 F.2d 771, 773 (3d Cir. 1978). However, the Government has stated that it will turn over Jencks Act material in a timely manner to avoid delays at trial. The Court considers this response by the Government as adequately addressing Defendant's request for Jencks Act material.

### D. Defendant's Request for Disclosure of Rule 404(b) Evidence

Fontanez seeks disclosure of any Rule 404(b) evidence the Government intends to offer at trial. (Fontanez Br. at 14–15). The Government recognizes its obligation to provide "reasonable notice" of any Rule 404(b) evidence it intends to offer at trial but argues that the Defendant's request for disclosure at this moment is premature. (Gov. Br. at 39–40). Courts in this District have generally held that ten days notice of Rule 404(b) evidence is sufficient. See, e.g., United States v. Evangelista, 813 F. Supp. 294, 302 (D.N.J. 1993) (holding that notice of Rule 404(b) evidence ten business days before trial constitutes "reasonable notice"); United States v. Karriem, No. 07-cr-00706, 2008 WL 5118200, at *12 (D.N.J. Dec. 4, 2008). Thus, the Court orders that the Government must disclose any Rule 404(b) evidence at least ten days before trial.

### E. Defendant's Request for Compelled Preservation of Prosecutorial Rough Notes, Drafts, and Final Reports

Fontanez requests the Government be ordered to preserve rough notes, drafts, and final reports prepared during the investigation that led to his arrest. (Fontanez Br. at 11–12). The Government has indicated that the federal prosecutors and law enforcement agents who participated in the investigation are aware of their obligation to preserve their notes of interviews

19

and handwritten drafts. (Gov Br. at 40). The Court considers this response by the Government as adequately addressing Defendant's request for compelled preservation of these documents.

### F. Defendant's Request for Permission to File Additional Motions

Fontanez requests permission to file additional motions at a later date. (Fontanez Br. at 15). The Government does not oppose his request but asks that the Court limit Defendant's right to file additional motions to matters raised by future Government disclosures. (Gov. Br. at 42). The Court agrees with the Government and orders that Defendant's right to file additional motions is limited to issues raised by future Government disclosures.

### III.  ORDER

For the foregoing reasons, it is **SO ORDERED** that Defendant's omnibus pretrial motion [ECF 84 and ECF 91] is **DENIED**; and it is further

**ORDERED** that the status conference previously scheduled for November 15, 2021 is hereby adjourned for a future date to be set by the Court; and it is further

**ORDERED**, that Defendant's omnibus pretrial motion [ECF 84 and ECF 91] is **TERMINATED**.

                     s/ Stanley R. Chesler
                     STANLEY R. CHESLER
                     United States District Judge

Dated: November 3, 2021